IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

UTICA DIVISION

| | |
|---|---|
| ASHLEY BIRD, TYLER DVORNSKI, and TIFFANY HUGHES, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>PETMED EXPRESS, INC.,<br><br>     Defendant. | Case No.:  6:25-cv-214 (GTS/MJK)<br><br>CLASS ACTION COMPLAINT<br><br>[DEMAND FOR JURY TRIAL] |

## CLASS ACTION COMPLAINT

Ashley Bird, Tyler Dvornski, and Tiffany Hughes (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against PetMed Express, Inc. ("PetMeds"), and allege on personal knowledge and on information and belief, as follows:

## NATURE THE ACTION

1. Plaintiffs' claim is simple: when something is always on sale, it's never on sale.

2. Many consumers thrive on finding the best deal.

3. Retailers know this and try to lure consumers with sales that promise huge savings. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1101 (9th Cir. 2013) (Sellers are "well aware of consumers' susceptibility to a bargain, [and] therefore have an incentive to lie to their customers.").

4. But the savings are false if a product's true price is misrepresented as a discount from an artificially inflated "regular" price ("False Reference Price") that no one actually pays.

5. The Federal Trade Commission prohibits retailers' use of False Reference Prices:

One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former priced is the

1

actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

16 C.F.R. § 233.1(a).

6.    From at least 2009 to June 2024, PetMeds used illegal False Reference Prices to sell its products.

7.    Plaintiffs bring this action against PetMeds to obtain redress for consumers who never received the discounts they were owed.

## JURISDICTION AND VENUE

8.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and Plaintiffs, and some of the members of each class, have different state citizenship from PetMeds.

9.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Dvornski and Bird reside in this District, as well as under 28 U.S.C. § 1391(b)(2) because PetMeds transacts substantial business in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and some of PetMeds' misconduct alleged herein occurred in this District.

10.    The Court has personal jurisdiction over PetMeds because some of the claims at issue arose in this District, PetMeds does substantial business in this District, and PetMeds conducts sufficient business with sufficient minimum contacts in this District.

## PARTIES

1.    Bird is an adult and she resides in Oneida County, New York.

2.    Dvornski is an adult and he resides in St. Lawrence County, New York.

2

3.      Hughes is an adult and she resides in Ventura County, California.

4.      PetMed Express, Inc. is a Florida corporation headquartered in Florida.

5.      PetMeds owns, operates, and controls https://www.1800petmeds.com/ ("Online Store"), a website where consumers may purchase products for their dogs, cats, and horses.

## COMMON FACTUAL ALLEGATIONS

**A.      Retailers Employ False Reference Pricing to Earn Greater Profits.**

6.      Consumer demand is influenced by "internal" and "external" reference prices.[1]

7.      Internal reference prices are "prices stored in memory" (*e.g.*, a consumer's price expectations adapted from past experiences).

8.      External reference prices are "provided by observed stimuli in the purchase environment" (*e.g.*, a "suggested retail price"). Mayhew, Glenn E. and Russell S. Winer, *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, Journal of Consumer Research 19, no. 1 (1992): 62-70.

9.      Consumers' internal reference prices adjust toward external reference prices when valuing a product.[2]

---

[1] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 68.

[2] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, p. 48.

10.     "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023).

11.     The following example of a hypothetical dog food seller, which parallels PetMeds' practice, illustrates how False Reference Prices harm consumers: the seller knows it can sell a particular bag of dog food for $20.00, which represents both the market price and the price at which the seller could regularly make a profit. Instead, however, the seller creates a fake "original" price for the dog food of $100.00 and advertises the dog food as "on sale" for 50% off, creating a (fake) "sale" price of $50.00. Consumers purchase the dog food for $50.00 believing they got a "good deal" since it was previously sold—*i.e.*, valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

12.     The consumer's presumption and purchase stem directly from the seller's deception. If the seller did not employ a False Reference Price, it would not be able to sell many, if any, bags of dog food for $50.00 because the true market value of the dog food is $20.00. However, False Reference Prices enable the seller to fabricate an increase in consumer demand for the dog food through the reasonable, but incorrect, perceived value of the dog food ($100.00) in connection with the substantial 50% off discount ($50.00). In this example, the seller has artificially inflated the market price for the dog food, from $20.00 to $50.00, by advertising the false "original" price or $100.00 and corresponding fake discount of 50%.

**B.      PetMeds Employed False Reference Pricing From At Least 2009 to June 2024.**

13.     From 2009 to June 2024, PetMeds offered discounts on all its products, all the time.

14.     PetMeds offered these discounts by displaying a "regular" price in strikethrough font to indicate that the "regular" price is outdated and has been replaced by a "sale" price, which often appeared in conspicuous font of a different size or color, and never in strikethrough font.

15.     Sometimes, PetMeds described the price disparity as a percentage discount.

16.     Sometimes, PetMeds described the price as available "today." *See* Fig. 1, Fig. 1.1.[3]



Fig. 1.1



Fig. 1

17.     Upon information and belief, at the time of every purchase made from 2009 to June 2024, PetMeds **NEVER** previously sold the purchased product at its advertised "regular" price.

18.     Plaintiff's counsel used the Internet Archive's Wayback Machine[4] to investigate the "regular" and "sale" prices of PetMeds' products. This investigation revealed that, for every

---

[3] The screenshots in Figs. 1 and 1.1 were taken from Defendant's Online Store on April 4, 2024. *See* https://www.1800petmeds.com/nexgard+chewables-prod10356.html.

[4] The Wayback Machine "allows users to browse versions of pages and documents as they existed at various points in history[.]" *Perera v. AG United States*, 536 F. App'x 240, 242 n.3 (3d Cir. 2013).

product investigated, PetMeds **NEVER** previously sold the product at its "regular" price.

### Nexgard Chewables (3-pack) – Dog (4-10 lbs)[5]

|  | Feb. 15, 2016 | Feb. 5, 2017 | Sept. 19, 2018 | May 2, 2019 | Jan. 11, 2020 |
|---|---|---|---|---|---|
| "Regular" Price | $78.74 | $79.99 | $86.13 | $73.84 | $79.99 |
| "Sale" Price | $57.99 | $58.64 | $58.64 | $46.15 | $55.99 |

|  | Jan. 17, 2021 | Jan. 21, 2022 | Feb. 3, 2023 | Aug. 1, 2023 |
|---|---|---|---|---|
| "Regular" Price | $84.27 | $89.99 | $104.56 | $104.56 |
| "Sale" Price | $58.99 | $62.99 | $73.19 | $73.19 |

### Heartgard Chewables for Cats (6-pack) – Cat (5-15 lbs)[6]

|  | Apr. 30, 2020 | Jan. 19, 2021 | Jan. 24, 2022 | Feb. 15, 2023 | Aug. 1, 2023 |
|---|---|---|---|---|---|
| "Regular" Price | $51.27 | $57.13 | $57.13 | $67.13 | $67.13 |
| "Sale" Price | $35.89 | $39.99 | $39.99 | $46.99 | $46.99 |

### Apoquel (price per tablet) – 3.6mg[7]

|  | Jan. 30, 2016 | May 8, 2017 | Sept. 19, 2018 | May 2, 2019 | Apr. 17, 2020 |
|---|---|---|---|---|---|
| "Regular" Price | $2.60 | $3.49 | $3.58 | $2.87 | $3.27 |
| "Sale" Price | $2.08 | $2.51 | $2.29 | $1.79 | $2.29 |

|  | Jan. 17, 2021 | Jan. 20, 2022 | Feb. 15, 2023 | Aug. 1, 2023 |
|---|---|---|---|---|
| "Regular" Price | $3.47 | $3.61 | $3.86 | $3.86 |
| "Sale" Price | $2.43 | $2.53 | $2.70 | $2.70 |

19.    PetMeds' use of False Reference Prices constitutes false, fraudulent, and deceptive advertising because the "regular" prices listed in strikethrough font are always greater than the

---

[5] *See* Complaint Exhibit A, Investigation into PetMeds' False Reference Prices, pp. 1-9.

[6] *See* Complaint Exhibit A, Investigation into PetMeds' False Reference Prices, pp. 10-14.

[7] *See* Complaint Exhibit A, Investigation into PetMeds' False Reference Prices, pp. 15-23.

prices PetMeds sells its products, and because other retailers routinely sold the same products, without False Reference Prices, for less.

20.     In other words, PetMeds' "regular" prices are a total fiction used exclusively as benchmarks from which the advertised fake discounts and corresponding "sale" prices are derived.

21.     PetMeds' marketing is designed to trick consumers into believing their purchase includes a discount, when all consumers get is the false impression of a bargain and a larger bill than they'd receive but for PetMeds' use of False Reference Prices.

22.     PetMeds engages in this practice knowing it has **NEVER** previously offered or sold the products at the advertised "regular" prices.

23.     For the avoidance of doubt, PetMeds' "regular" prices are not: (a) former prices; (b) recent, regularly offered former prices; (c) prices at which identical products are sold elsewhere in the market; or (d) MSRP.[8]

## ALLEGATIONS SPECIFIC TO PLAINTIFFS

**A.    ASHLEY BIRD**

24.     Bird resides in Rome, New York.

25.     On March 6, 2024, Bird purchased Revolution Plus – Flea, Tick, Heartworm, + Broad Spectrum Prevention Topical for Cats (11-22lbs), 3 Pack ("Revolution") from PetMeds.

---

[8] *See* Complaint Exhibit B, Plaintiff's Counsel's MSRP Investigation indicating:
   (a) the MSRP for Heartgard Plus Green (6-pack) for Dogs 26-50lbs was $66.19 on February 16, 2023—PetMeds' "reg." price for the same product was $84.99 on February 4, 2023;
   (b) the MSRP for Nexgard (6-pack) for dogs 4-10lbs was $144.99 on December 7, 2022—PetMeds' "reg." price for the same product was $190.56 on February 3, 2023); and
   (c) the MSRP for Nexgard Chewables (6-pack) for dogs 24-60lbs was $144.99 on January 23, 2023—PetMeds' "reg." price for the same product was $208.56 on February 3, 2023.

26.     Below is a screenshot from the Internet Archive's Wayback Machine that displays PetMeds' Revolution advertisement as it existed on February 22, 2024. Upon information and belief, the advertisement did not change between February 22, 2024 and the time of Bird's purchase on or about March 6, 2024.



Fig. 3.[9]

27.     Although this screenshot is specific to cats weighing between 3 and 6 pounds, it confirms that at the time of Bird's purchase, PetMeds represented that (a) Revolution's "reg." price was displayed in strikethrough font, (b) Revolution's sale price was displayed in non-strikethrough

---

[9] *See* https://web.archive.org/web/20240222071708/https://www.1800petmeds.com/revolution%2Bplus-prod12075.html (captured Feb. 13, 2025).

font, and (c) Bird could "save 30%" off the regular price appearing in strikethrough font by completing a purchase "today." *See* Fig. 3.

28.     The screenshot also confirms that the sale price displayed in non-strikethrough font is unrelated to PetMeds' AutoShip sale, with which shoppers can save 35% instead of 30%.

29.     After notifying Bird of Revolution's "regular" and sale prices, and the 30% discount their price disparity represented, Bird purchased Revolution from PetMeds on March 6, 2024 for a sale price of $85.48. *See* Complaint Exhibit E, Bird Order Confirmation.[10]

30.     This sale price is 30% less than the $122.11 "regular" price that PetMeds displayed for Revolution at the time of Bird's purchase.

31.     However, PetMeds **NEVER** offered Revolution for sale at this "reg." price.

32.     In fact, at the time of Bird's purchase, PetMeds had **NEVER** sold Revolution for more than the supposed "sale" price that Bird paid.

33.     The table below summarizes PetMeds' False Reference Prices for Revolution for cats 3 to 6 pounds. Although Bird purchased Revolution for cats 11 to 22 pounds, the table demonstrates that on any given date, PetMeds **NEVER** displayed a "Regular" price that matched or exceeded the "Sale" price of Revolution on an earlier date. In other words, the table shows that PetMeds "Regular" prices are False Reference Prices unrelated to its past sales.

|                    | Sept. 20, 2020 | July 26, 2021 | July 6, 2022 | March 15, 2023 | Feb. 22, 2024 |
|--------------------|----------------|---------------|--------------|----------------|---------------|
| "Regular" Price    | $76.94         | $80.04        | $84.27       | $89.99         | $94.26        |
| "Sale" Price       | $53.86         | $56.03        | $58.99       | $62.99         | $65.98[11]    |

---

[10] The sale price of Bird's purchase is greater than what is shown in Fig. 3 because her cat weighs between 11 and 22 pounds, and Fig. 3 shows the prices for cats between 3 and 6 pounds.
[11] *See* Complaint Exhibit F, Investigation of Revolution's False Reference Prices.

**B.    TYLER DVORNSKI**

34.    Dvornski resides in Lisbon, New York.

35.    On September 19, 2023, Dvornski purchased Bravecto – Flea & Tick Prevention Chewable Tablet for Dogs (44-88lbs, 1 Pack) ("Bravecto") from PetMeds.

36.    Below is a screenshot from the Internet Archive's Wayback Machine that displays PetMeds' Bravecto advertisement as it existed on September 30, 2023. Upon information and belief, the advertisement did not change between September 30, 2023 and the time of Dvornski's purchase on September 19, 2023.



Fig. 2.[12]

37.    Although this screenshot is specific to dogs weighing between 4 and 10 pounds, it confirms that at the time of Dvornski's purchase, PetMeds represented that (a) Bravecto's "reg." price was displayed in strikethrough font, (b) Bravecto's sale price was displayed in non-

---

[12] *See* https://web.archive.org/web/20230930134347/https://www.1800petmeds.com/Bravecto%2BChews-prod11638.html (captured Feb. 13, 2025).

strikethrough font, and (c) Dvornski could "save 30%" off the regular price appearing in strikethrough font by completing a purchase "today." *See* Fig. 2.

38.     After notifying Dvornski of Bravecto's "regular" and sale prices, and the 30% discount their price disparity represented, Dvornski purchased Bravecto from PetMeds on September 19, 2023 for $71.99. *See* Complaint Exhibit C, Dvornski Order Confirmation.[13]

39.     This sale price is 30% less than the $102.84 "regular" price that PetMeds displayed for Bravecto at the time of Dvornski's purchase.

40.     However, PetMeds **NEVER** offered Bravecto for sale at this "reg." price.

41.     In fact, at the time of Dvornski's purchase, PetMeds had **NEVER** sold Bravecto for more than the supposed "sale" price that Dvornski paid.

42.     The table below summarizes PetMeds' False Reference Prices for Bravecto for dogs 4 to 10 pounds. Although Dvornski purchased Bravecto for dogs 44-88 pounds, the table demonstrates that on any given date, PetMeds **NEVER** displayed a "Regular" price that matched or exceeded the "Sale" price of Bravecto on an earlier date. In other words, the table shows that PetMeds "Regular" prices are False Reference Prices unrelated to its past sales.

|                  | July 20, 2018 | June 19, 2020 | Sept. 27, 2021 | Sept. 24, 2022 | Sept. 30, 2023 |
|------------------|---------------|---------------|----------------|----------------|----------------|
| "Regular" Price  | $77.09        | $81.41        | $81.41         | $89.99         | $97.13         |
| "Sale" Price     | $52.49        | $56.99        | $56.99         | $62.00         | $67.99         |

|                  | June 25, 2024 |
|------------------|---------------|
| "Regular" Price  | $102.84       |
| "Sale" Price     | $71.99[14]    |

---

[13] Dvornski paid more than is shown in Fig. 2 because his dog weighs between 44 and 88 pounds, and Fig. 2 shows the prices for dogs between 4 and 10 pounds.

[14] *See* Complaint Exhibit D, Investigation of Bravecto's False Reference Prices.

C.    **TIFFANY HUGHES**

43.    Hughes resides in Simi Valley, California.

44.    On June 24, 2022, Hughes purchased Proin 75MG 180CT BTL Chew Tablets ("Proin") from PetMeds.

45.    Below is a screenshot from the Wayback Machine that displays PetMeds' Proin advertisement as it existed on May 27, 2022. Upon information and belief, the advertisement did not change between May 27, 2022 and the time of Hughes' purchase on June 24, 2022.



Fig. 4.[15]

46.    Although this screenshot is specific to 25 mg tables, it confirms that at the time of Hughes' purchase, PetMeds represented that (a) Proin's "reg." price was displayed in strikethrough font, (b) Proin's sale price was displayed in non-strikethrough font, and (c) Hughes could "save 30%" off the regular price appearing in strikethrough font by completing a purchase. *See* Fig. 4.

---

[15] *See* https://web.archive.org/web/20220527130537/https://www.1800petmeds.com/proin-prod10304.html (captured Feb. 13, 2025).

47.     After notifying Hughes of Proin's "regular" and sale prices, and the 30% discount their price disparity represented, Hughes purchased Proin from PetMeds on June 24, 2022 for a sale price of $114.36. *See* Complaint Exhibit G, Hughes Order Confirmation.[16]

48.     This sale price is 30% less than the $163.37 "regular" price that PetMeds displayed for Proin at the time of Hughes' purchase.

49.     However, PetMeds **NEVER** offered Proin for sale at this "reg." price.

50.     In fact, at the time of Hughes' purchase, PetMeds had **NEVER** sold Proin for more than the supposed "sale" price that Hughes paid.

51.     The table below summarizes PetMeds' False Reference Prices for 60 capsules of Proin 25 mg. Although Hughes purchased 180 capsules of Proin 75 mg, the table demonstrates that on any given date, PetMeds **NEVER** displayed a "Regular" price that matched or exceeded the "Sale" price of Proin on an earlier date. In other words, the table shows that PetMeds "Regular" prices are False Reference Prices unrelated to its past sales.

|  | March 4, 2020 | July 23, 2021 | May 27, 2022 | March 22, 2023 | Feb. 26, 2024 |
|---|---|---|---|---|---|
| "Regular" Price | $23.07 | $23.07 | $33.13 | $44.27 | $50.39 |
| "Sale" Price | $16.15 | $16.15 | $23.19 | $30.99 | $35.27[17] |

52.     PetMeds' False Reference Prices and fake "sales" prices are routinely more than PetMeds' competitors charge for the same product.

53.     PetMeds knows its False Reference Prices are false, deceptive, misleading, and unlawful.

---

[16] The sale price of Hughes' purchase is greater than what is shown in Fig. 4 because she purchased 75 mg tablets, and Fig. 4 shows the prices for 25 mg tablets.

[17] *See* Complaint Exhibit H, Investigation of Proin's False Reference Prices.

54.     PetMeds concealed from, and intentionally failed to disclose to, Plaintiffs the truth of its False Reference Prices and corresponding false discounts.

55.     PetMeds had a duty to Plaintiffs to disclose the truth about its False Reference Prices and corresponding false discounts, and to not affirmatively mislead Plaintiffs.

56.     Plaintiffs were damaged and suffered losses because of PetMeds' false, deceptive, misleading, and unlawful conduct

## CLASS ACTION ALLEGATIONS

57.     Plaintiffs bring this action individually and on behalf of all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

58.     Dvornski and Bird seek to certify the following New York Class: "All persons who, while in the state of New York and within the applicable statute of limitations period, purchased one or more products from PetMeds' Online Store at discounts from a False Reference Price and who have not received a refund or credit for their purchase(s) before the date Plaintiffs filed this Class Action Complaint."

59.     Hughes seeks to certify the following California Class: "All persons who, while in the state of California and within the applicable statute of limitations period, purchased one or more products from PetMeds' Online Store at discounts from a False Reference Price and who have not received a refund or credit for their purchase(s) before the date Plaintiffs filed this Class Action Complaint."

60.     Excluded from the classes are PetMeds, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, narrow, or otherwise modify the classes as the litigation continues and discovery proceeds.

14

61.     Fed. R. Civ. P. 23(a)(1): Each Class is so numerous that joinder is impracticable.

62.     In a lawsuit pending in Pennsylvania, PetMeds asserts it made "separate orders total[ing] in the hundreds of thousands" into Pennsylvania from April 2018 to May 2024. *See Fitchett v. PetMed Express, Inc.*, Case No. 2:24-cv-00710-RJC, Doc. 1, Notice of Removal (W.D. Pa. May 13, 2024).

63.     The Class is identifiable by PetMeds' records.

64.     Fed. R. Civ. P. 23(a)(2), (b)(3): Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over individual issues. For example, there is a single common answer to the question of whether PetMeds violated New York and California consumer protection laws by advertising False Reference Prices in the Online Store and falsely advertising price discounts on products sold in the Online Store. The answer to this question is the same for Plaintiffs and each class member, and Plaintiffs and each class member require the same proof to answer this question. This question, and other common questions of law and fact, predominate over any individual issues.

65.     Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of the claims of each class member because the claims are based on the same legal theories and arise from the same conduct.

66.     Fed. R. Civ. P. 23(a)(4): Plaintiffs are adequate representatives of each class member because the interests of Plaintiffs and each class member align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of each class member and have no interest antagonistic to any class member. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer rights litigation specifically.

67.    Fed. R. Civ. P. 23(b)(3): Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief that Plaintiffs and each class member may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiffs and each class member. Additionally, requiring Plaintiffs and each class member to file individual actions would impose a crushing burden on the court system. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

68.    All class members, including Plaintiffs, were exposed to one or more of PetMeds' misrepresentations or omissions of material fact claiming that former reference prices were legitimate. Due to the scope and extent of PetMeds' consistent false sale prices, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the classes. In addition, it can be reasonably presumed that all class members, including Plaintiffs, affirmatively acted in response to the representations contained in PetMeds' false advertising scheme when purchasing merchandise sold by PetMeds.

69.    Plaintiffs are informed that PetMeds keeps extensive computerized records of its customers. PetMeds has one or more databases through which a significant majority of class members may be identified and ascertained, and it maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

**CAUSE OF ACTION**

**COUNT I**
**Violation of the New York Consumer Protection from Deceptive Acts and Practices Act**
**("NYDAPA")**
**N.Y. GBL § 349, et seq**
*On behalf of Bird, Dvornski, and the Proposed New York Class*

70.     Bird and Dvornski reallege and incorporate by reference all previous paragraphs of this complaint as if set forth fully herein.

71.     This claim is brought in Dvornski's and Bird's individual capacities and on behalf of the members of the proposed New York Class against PetMeds for violations of the New York Deceptive Acts and Practices Act ("NYDAPA"), N.Y. Gen. Bus. Law § 349.

72.     NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

73.     PetMeds' conduct, as set forth herein, constitutes deceptive acts or practices.

74.     Dvornski, Bird, and the proposed New York Class members are "person[s] who have been injured" by reason of PetMeds' violation of N.Y. Gen. Bus. Law §349.

75.     PetMeds' actions as set forth herein occurred in the conduct of "business, trade or commerce" under NYDAPA.

76.     In the conduct of its business, PetMeds advertised False Reference Prices that gave consumers, including Dvornski, Bird, and members of the proposed New York Class, the impression that its products were regularly sold on the market for a substantially higher price than they were; therefore, causing a false impression that the products sold at PetMeds' Online Store were worth more than they were.

77.     Dvornski, Bird, and members of the proposed New York Class had no way of discerning that PetMeds' representations were false and misleading.

78.    PetMeds thus violated the NYDAPA by making statements that give the false impression that the products sold by PetMeds are worth more than they actually are.

79.    PetMeds knew or should have known that its conduct violated NYDAPA and owed a duty to Dvornski, Bird, and members of the proposed New York Class to refrain from engaging in deceptive acts or practices, and to disclose the truth about its false discounts.

80.    PetMeds intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the prices of its products with the intent to mislead Dvornski, Bird, and members of the proposed New York Class.

81.    PetMeds' misleading and false advertisements were material to Dvornski, Bird, and members of the proposed New York Class, as they relate to the price of the product each consumer received and paid for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether to purchase the product.

82.    But for PetMeds' use of False Reference Prices, Dvornski would not have paid $71.99 to PetMeds for Bravecto on September 19, 2023.

83.    But for PetMeds' use of False Reference Prices, Bird would not have paid $85.48 to PetMeds for Revolution on March 6, 2024.

84.    As a result of PetMeds' violation of the NYDAPA, Dvornski, Bird, and members of the proposed New York Class suffered losses equal to the discounts that PetMeds offered, and that Dvornski, Bird, and members of the proposed New York Class accepted by making a purchase but never received.

85.    Dvornski, Bird, and members of the proposed New York Class are entitled to all the damages, remedies, fees, and costs available under NYDAPA, including, but not limited to

recovery of actual damages and/or fifty dollars in statutory damages, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

**COUNT II**
**Violation of the New York False Advertising Law ("NYFAA")**
**N.Y. GBL § 350, et seq.**
***On behalf of Bird, Dvornski and the Proposed New York Class***

86.    Bird and Dvornski reallege and incorporate by reference all previous paragraphs of this complaint as if set forth fully herein.

87.    This claim is brought in Dvornski's and Bird's individual capacities and on behalf of the members of the proposed New York Class against PetMeds for violations of the New York False Advertising Act ("NYFAA"), N.Y. Gen. Bus. Law § 350.

88.    The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. Gen. Bus. Law § 350(a).

89.    For more than 15 years, PetMeds engaged in an unfair, untrue, and misleading advertising campaign using False Reference Prices even though PetMeds knew it never offered nor sold the products at the advertised "regular" prices, which were materially greater than the true prevailing prices (*i.e.*, PetMeds' actual sale price).

90.    This deceptive marketing practice gave consumers the false impression that their purchase includes a discount and that PetMeds' products were worth more than they were.

91.    PetMeds intentionally and knowingly misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the prices of their products with the intent to mislead Dvornski, Bird, and members of the proposed New York Class.

19

92.     PetMeds' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Dvornski, Bird, and members of the proposed New York Class, about the price of its products. Dvornski, Bird, and members of the proposed New York Class reasonably relied upon PetMeds' false discounts when purchasing products from PetMeds. Dvornski, Bird, and members of the proposed New York Class would not have made such purchases but for PetMeds' representations regarding the substantial discount being offered for the products.

93.     As a direct and proximate result of PetMeds' misleading and false advertisements, as well as PetMeds' deceptive and unfair acts and practices made during PetMeds' businesses, Dvornski, Bird, and the proposed New York Class suffered ascertainable loss and actual damages.

94.     Dvornski, Bird, and members of the proposed New York Class are entitled to all the damages, remedies, fees, and costs available under NYFAA, including, but not limited to, recovery of actual damages and/or five hundred dollars per violation, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

**COUNT III**
**Violation of California's Unfair Competition Law ("UCL")**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq*.**
***On behalf of Hughes and the Proposed California Class***

95.     Hughes realleges and incorporates by reference all previous paragraphs of this complaint as if set forth fully herein.

96.     This claim is brought in Hughes' individual capacity and on behalf of the members of the proposed California Class against PetMeds for violations of the UCL. Cal. Bus. & Prof. Code §§ 17200, *et. seq*.

97.     The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

98.     The UCL imposes strict liability. Hughes need not prove that PetMeds intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

**"Unfair" Prong**

99.     A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

100.    PetMeds' actions constitute "unfair" business practices because, as alleged above, for more than 15 years, PetMeds engaged in misleading and deceptive price comparison advertising that represented False Reference Prices and corresponding deeply discounted "sale" prices. PetMeds' acts and practices offended an established public policy of transparency in pricing, and constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

101.    The harm to Hughes and the proposed California Class outweighs the utility of PetMeds' practices because PetMeds' practice of advertising false discounts provides no utility and only harms consumers. There were reasonably available alternatives to further PetMeds' legitimate business interests other than the misleading and deceptive conduct described herein.

**"Fraudulent" Prong**

102.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

103.    PetMeds' acts and practices alleged above constitute fraudulent business acts or practices as it has deceived Hughes and the proposed California Class and is highly likely to deceive members of the consuming public. Hughes and members of the proposed California Class relied on PetMeds' fraudulent and deceptive representations regarding its false or outdated "original prices" for products sold by PetMeds through its Online Store. These misrepresentations played a substantial role in the decision of Hughes and the proposed California Class to purchase a product at a purportedly steep discount, and Hughes and the proposed California Class would not paid what they paid but for PetMeds' misrepresentations.

**"Unlawful" Prong**

104.    A business act or practice is "unlawful" if it violates any other law or regulation.

105.    PetMeds' acts and practices constitute unlawful business acts or practices as it has violated state and federal law in connection with its deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(1), and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTCA, false former pricing schemes are described as deceptive practices that would violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article.  If the former priced is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison.  Where the former price is genuine, the bargain being advertised is a true one.  If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not

receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made.  The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of her business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

106.    California law also expressly prohibits false former pricing schemes. The FAL, Cal.

Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price*," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

107.    The CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

108.    The acts and practices alleged were intended to or did result in violations of the FTCA, the FAL, and the CLRA.

109.    PetMeds' practices misled Hughes and the proposed California Class and the public. Consequently, PetMeds' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

110.    Pursuant to the UCL, Hughes and the proposed California Class are entitled to preliminary and permanent injunctive relief enjoining PetMeds from further engagement in this unfair competition, as well as disgorgement and restitution to Hughes and members of the proposed California Class of all PetMeds' revenues wrongfully obtained from because of PetMeds' unfair competition, or such portion of those revenues as the Court may find equitable.

**COUNT IV**
**Violation of California's False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
***On behalf of Hughes and the Proposed California Class***

111.    Hughes realleges and incorporates by reference all previous paragraphs of this complaint as if set forth fully herein.

112.    This claim is brought in Hughes' individual capacity and on behalf of the members of the proposed California Class against PetMeds for violations of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

113.    Cal. Bus. & Prof. Code § 17500 provides:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of . . . personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that . . . personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .

(Emphasis added).

114.    The "intent" required by § 17500 is the intent to make or disseminate personal property (or cause such personal property to be made or disseminated), and not the intent to mislead the public in the making or dissemination of such property.

115.    Similarly, this section provides, "no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price … within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement."  Cal. Bus. & Prof. Code § 17501.

116.    For more than 15 years, PetMeds advertised discounts from False Reference Prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (*i.e.*, PetMeds' actual sale price). This conduct constitutes an unfair, untrue, and misleading practice. PetMeds' deceptive marketing practice gave consumers the false impression that the products on PetMeds' Online Store were regularly sold on the market for a substantially higher price than the price for which they were sold. Moreover, PetMeds' deceptive marketing practice misled consumers by creating a false impression that the products sold through its Online Store were worth more than their actual worth.

117.    PetMeds misled consumers by making untrue and misleading statements and failing to disclose what is required as stated in the Code alleged above.

118.    As a direct and proximate result of PetMeds' misleading and false advertisements, Hughes and members of the proposed California Class have suffered injuries in fact and have lost money. As such, Hughes requests that this Court order PetMeds to restore this money to Hughes and members of the proposed California Class, and to enjoin PetMeds from continuing these unfair practices in violation of the FAL in the future.  Otherwise, Hughes and members of the proposed California Class, and the broader general public, will be irreparably harmed and/or denied an effective and complete remedy.

## **JURY TRIAL DEMANDED**

Plaintiffs request a jury trial on all claims so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for an order:

a.     Certifying each class and designating Plaintiffs as Class Representatives and their counsel as Class Counsel;

b.     Awarding restitution and disgorgement of all profits and unjust enrichment that PetMeds obtained from Plaintiffs and the class members because of PetMeds' unlawful, unfair, and fraudulent business practices described herein;

c.     Awarding Plaintiffs and members of the classes actual, statutory, and punitive damages;

d.     Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining PetMeds from continuing the unlawful practices as set forth herein, and directing PetMeds to identify, with Court supervision, victims of its misconduct and pay them all money they are owed;

e.     Ordering PetMeds to engage in a corrective advertising campaign;

f.     Awarding attorneys' fees and costs; and

g.     For such other and further relief as the Court may deem necessary or appropriate.

Respectfully Submitted,

Dated: February 14, 2025             */s/ Kevin W. Tucker*

Kevin W. Tucker (he/him) (NDNY 517520)
Kevin J. Abramowicz (*PHV forthcoming*)
Kayla Conahan (She/Her) (*PHV forthcoming*)
Jessica Liu (She/Her) (*PHV forthcoming*)
Stephanie Moore (She/Her) (*PHV forthcoming*)
Chandler Steiger (She/Her) (*PHV forthcoming*)
EAST END TRIAL GROUP LLC
6901 Lynn Way, Suite 503
Pittsburgh, PA 15208
Tel. (412) 877-5220
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com

26

kconahan@eastendtrialgroup.com
jliu@eastendtrialgroup.com
smoore@eastendtrialgroup.com
csteiger@eastendtrialgroup.com

Counsel for Plaintiff